## MINNEAPOLIS ST. RY. CO. v. CITY OF MINNEAPOLIS.

(Circuit Court, D. Minnesota, Fourth Division. August 24, 1907.)

1. INJUNCTION—POWERS OF COURT—RESTRAINING PUBLICATION OF ORDINANCE.

The general rule that a court of equity will not restrain the enforcement of an ordinance or other legislative act until it has been fully completed so far as legislative action can go does not apply to an ordinance which has been finally passed by a city council and approved by the mayor, and nothing remains to be done to render it immediately effective except its publication, which is merely a ministerial act, and in such a case upon a proper showing made the court has power to enjoin the publication.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 154.]

2. STREET RAILROADS—STATUTE GOVERNING INCORPORATION—MINNESOTA STATUTE.

Gen. St. Minn. 1866, c. 34, relates to the formation of corporations. Title 1 provides generally for corporations which are or may be authorized to exercise the power of eminent domain, and specifies certain public service corporations, such as those formed for the construction of railways, canals, and works of like character. Title 2 provides for all other corporations for pecuniary profit, all those specified therein being for the conducting of purely private enterprises. Held that, while street railroad companies are not specifically mentioned under either title, the nature of their business is such as to render them quasi public corporations, which might properly be authorized to exercise the power of eminent domain and to bring them within the generic term "railways," and that a street railroad company organized under said chapter came within the provisions of and derived its powers from title 1, having the right as therein provided to fix the term of its corporate existence at fifty years.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Street Railroads, § 22.]

3. SAME—CONTRACT WITH CITY—EFFECT OF CHANGE OF MOTIVE POWER.

A city ordinance granting a franchise to a street railroad company and accepted by the company reserved the right to the city council after five years to fix just and reasonable fares provided they should not be reduced below five cents per passenger on any continuous line. It provided for the use of animal or pneumatic power on the company's lines, but permitted it to connect with other lines using power "similar to that authorized to be used on street railways by the city council," subject to the restriction that it should not allow locomotives or ordinary railroad cars to be run over its tracks unless with the consent of the council. Held, that the fact that after a number of years the company changed its motive

power to electricity, with the consent of the council, did not terminate the contract made by the ordinance so as to give the city the right to reduce fares below five cents in violation of its provisions.

4. SAME—EFFECT OF SUBSEQUENT CONTRACTS.

A provision in a contract between a city and a street railroad company that the city should not reduce fares below five cents was not abrogated by a subsequent contract providing that "in the construction, maintenance and operation" of its lines the company should be subject to all present or future ordinances of the city.

In Equity.

M. D. Munn, N. M. Thygeson, and M. B. Koon, for complainant.

Frank Healy and Lancaster & McGee, for defendant.

LOCHREN, District Judge (orally). This is certainly a very important case, involving, as it does, the rights of this corporation which has constructed, operated and managed all the street railways in this city for so long, and affecting also the public interests, the rights of the people who are the patrons of this road, and from necessity have to pay for the accommodations which they receive from the road.

It is claimed on the part of the complainant that it is a corporation formed under title 1 of chapter 34 of the General Statutes of the state for 1866; its articles having been executed on the 23d day of June, 1873, and fixing the date of the commencement of its existence as of July 1st of that year, and of its continuance as 50 years from that time. It claims to have been such a corporation as might have been organized, and that it was organized, under that title, and that it still continues, as that term of 50 years has not expired. It also claims that some two years later, on July 9, 1875, by an ordinance passed by the city of Minneapolis allowing this corporation to practically maintain and operate a street railway upon the streets and avenues of the city, and providing, among other things, that the street car company might charge fares to the extent of five cents for each passenger, and that the city council after five years might regulate the rates of fare, but should not reduce the fare below five cents, that the city is under a valid contract obligation not to reduce the rate of fares below five cents. It is perhaps unnecessary to discuss what the effect of that reserved power in the city council was. It is certain that it is prohibited by that contract in its power to lower fares below the sum of five cents during the life of that contract. The case is submitted on bill and answer, and, there being no contest in respect to any matters of fact, it is admitted that the complainant company went on under that ordinance and constructed a system of street railway in this city, the motive power being animal power at that time, that being one of the kinds of power that was mentioned in the ordinance to which I have referred, and that it has gone on from that time to this operating the system of railway upon the streets of the city which have been designated for that purpose from time to time by the city council, and that in 1889 and 1890, by consent of the council, and in accordance with ordinances passed by the council, and accepted by the company, it was first agreed to establish upon certain designated streets of the city cable lines to be operated under a change in the charter, respecting motive power, and that these afterwards were changed to

electric lines, there being prior to that an ordinance providing for the occupation of one street for experiments as to the efficiency of electricity as a motive power; that following this ordinance, and especially the ordinance of September 19, 1890, the whole system has been changed so far as the motive power is concerned to the use of electricity as a motive power, but complainant claims that there has been no change in the provision of the ordinance I am speaking of, of 1875, the contract provision in that ordinance, with respect to fares from that time to the present, and it is complained that on the 9th of February of the present year the city council passed an ordinance reducing the amount of fare which the complainant was entitled to collect from passengers by providing that it should issue 6 tickets for 25 cents, each of those tickets representing a full fare, and that the effect of this ordinance is to impair the obligation of the contract entered into between the complainant and the defendant on the 9th of July, 1875, by the ordinance that I have referred to, and that one probable, immediate result would be the danger of annoyances to the servants of the company, the conductors and others on street cars, by reason of citizens claiming under this last ordinance the right to have these tickets, 6 for 25 cents, which, if refused by the conductors, would lead to disputes and altercations, and tend to the prejudice of the business, and at any rate to the disturbance of the company in carrying on its business, and that the company would also be liable to numerous actions which might be brought—not only such actions as might be brought by the city, but suits brought by all passengers upon the railway system who were refused this reduction of fare. Therefore a court of equity should step in and relieve the complainant from this danger, and to that end it would be entitled to have the city, and city officials, enjoined from attempting to enforce this ordinance on the ground that it would impair the obligation of said contract.

The first objection made by the defendant is that this action is premature, and that there is no such ordinance as the alleged ordinance of February 9, 1907, in force, and therefore the complainant is in no danger from that ordinance, because it has not been published as required by the city charter to be published before it can be in force; that it is still in the same condition that it would be if it was not fully enacted by the city council—that is, that it remains an uncompleted act—and that courts will not ordinarily attempt by injunction to tie the hands of legislative bodies or those that are invested with legislative powers while they have not completed the legislative act which is complained of. I think that that position is true as a general rule. There may be exceptions to it, but I think they are very few and not to be extended. It is fair to presume that while a matter is still in the hands of the Legislature or the city council, or anybody having the power of legislation, the presumption the courts ought to entertain is that before it leaves their hands, before it is completed, right and justice will be done, and that it would be improper to attempt to harass such body by any injunction, and such writ would not ordinarily be issued under those circumstances. Therefore the question is whether, under the facts in this case, this is a completed ordinance and one

which menaces the complainant in the complainant's present situation, although it has not been published.

It seems to me to be completed. It has gone through all the steps which the council would take in the passage and enactment of an ordinance. Of course, it is not necessary that I should attempt to rehearse what those would be from the introduction of the proposed ordinance in the body by some of its members, passing through the different readings and references to committees and reports and amendments, and everything of that kind, until its final passage on a vote of yeas and nays; but it appears to me, in fact, that this ordinance has passed through all those steps, and that it is an ordinance passel by the council, transmitted to the mayor, and which has received his signature, he having the right, and it being his duty, to sign it if he approves of it, and if he does not approve of it to return it to the council that passed it with his objections, when there would remain legislative action to be taken; that is, the vote by which it was passed would be reconsidered and the objections made by the mayor would receive consideration from the council, and they could act upon it as to them seemed right and proper, with the right, of course, to reject the ordinance at that stage, or, if they deemed it should be passed, to pass it over the veto of the mayor, if it received the requisite number of votes for that purpose. It had passed through that stage. There was nothing further in the way of performance of any legislative function, it seems to me, to be done in respect to that ordinance. It is a completed ordinance. If it is constitutional, it is then a valid ordinance, although the operation of it is suspended until the publication, which would give notice to every person of the fact that such an ordinance was passed and is in existence. It seems to me this does not differ at all from what would be the case if an ordinance was passed, as acts of the Legislature are frequently passed, to take effect at a subsequent time. They are complete as far as legislative action can go at the time of the passage. There is no legislative action to be taken between that time and the time they go into effect; and there is no legislative action in this case, it seems to me, between the time when this ordinance was signed and approved by the mayor, the last legislative action in connection with it, and the time when it shall be, if it ever happens, published. That is merely a ministerial act, the publication of it, which I think, according to the provisions of the city charter, and the general law in relation to villages and cities, would devolve upon the clerk perhaps to pass the proper copy of it to the printer, and the printer to print it. The action of the clerk would not be legislative. The action of the printer would not. It would not be legislative at all, and it is not interfering, therefore, with legislative functions to grant an injunction at the present time and to enjoin the publication of it, because that is an act which puts it in force and puts the complainant in danger of it, which would be liable to bring upon the complainant the strenuous demands of persons who would become passengers upon the street cars for conformity with the ordinance, and liable to bring about disturbance if those demands were not complied with; and liable to bring, also, some kind of suits on the part of the city for the purpose of compelling the complainant to comply with it.

And therefore I hold that this suit is not prematurely brought, and that it is proper to restrain the publication of the ordinance, it having passed the legislative state. I do not know of any such case. None has been cited upon the argument, although the argument has been unusually full and able. There has no case been cited that I remember of that involved the question at all. I do not know of any case, except, perhaps, a suit that was commenced in the state of North Dakota in the federal court by the Northern Pacific Railway Company against the Board of Railway and Warehouse Commissioners, if that is the proper title to that body in that state, I am not sure, but it has the same functions as that board has in this state of fixing rates, and by the act constituting that board and empowering it to act it is required, when it fixes rates, to publish them in a certain paper, and they are to go into effect, if my recollection serves me, at a certain time after such publication has been completed. In that case the action was commenced by the Northern Pacific Railway Company against the Board of Railway and Warehouse Commissioners, if that is the proper title, and also against the publisher of the newspapers, and perhaps other state officials, to restrain them from attempting to put the order of that commission into force and from publishing the order, and a restraining order was issued in the order to show cause why a temporary injunction should not be granted. My information is that that matter was settled and did not go really any further, so there was no adjudication in the case as to whether that was proper practice or not; but it was the practice then adopted. I think there was an arrangement made by which the Railroad and Warehouse Commission made some changes in the rates so that the railroad company agreed to them and the litigation did not go on.

This brings me to consider the principal questions in the case. It is contended on the part of the complainant, as I have said, that it is a corporation of the character mentioned, and that its duration is for 50 years; that it was organized under title 1, c. 34, of the General Statutes of 1866. This question is important whether it was organized under title 1 or some other title of chapter 34 of the General Statutes, because, if it was organized under title 1, then it still continues under the organization that was formed by its articles, and still continues such corporation at this time, as title 1 allows corporations formed under that title to be formed for the period of 50 years. It requires the articles of incorporation to state the date of commencement and the time of the continuance of the corporation, and in its articles the complainant in this case did state the time of its commencement to be the 1st of July, 1873, and the date of its continuance to be 50 years. It is claimed on the part of the defendant that it was not organized under title 1, and could not be, that it was a street railway, and that there was no provision that such a corporation might be formed under that title for that purpose, the purpose of establishing and conducting and operating a street railway; but that it was a corporation which might be organized under title 2 of chapter 34, and that, in determining whether it was under one title or the other, the recitals in the articles of incorporation would not be conclusive, but that it should be determined by what was stated in the articles as to the objects of the

corporation and the purpose for which it was formed. In that respect I apprehend that the statement of counsel for defendant as to what would determine the character of such corporations is correct, and therefore we will have to look into that statute and consider the character of this corporation to determine whether it was such a one as could have been formed under the provisions of title 1 of that chapter.

There are in that chapter five titles under which corporations could be formed. Title 5 relates to cemetery corporations. Title 4 relates to religious corporations. Those could .not be considered, of course. Title 3 relates to corporations that are formed not for pecuniary profit, such as colleges and cemeteries and lyceums and societies, either legal, medical, or scientific. It certainly does not come under that. It could not have been formed under title 3. Title 1 relates to corporations that are authorized, or may be authorized, to exercise the right of eminent domain. That is the general heading of the title. Title 2 relates to corporations that are formed for pecuniary profit, other than those that are allowed to be formed under title 1. In looking through this title and the description of corporations that may be formed under it, it seems they are all for the purpose of conducting private enterprises. Mining,, smelting, manufacturing, lumbering, agricultural, mechanical, and chemical businesses are the kinds that are mentioned specifically. Each one of those kinds of business is a private business in which the public has no concern. They are entirely for the purpose—

. Judge Lancaster: Does your honor have in mind the amendments, or just 1866?

The Court: I was referring to the law as it stood when this corporation was formed, the law of 1866. Now, this is a corporation which evidently is not formed simply for the purposes of private gain. It is not a private business. It is a quasi public corporation, a corporation formed for the performance of public service wholly. Its entire business is the carriage of passengers for hire, and it is obliged to carry every one who offers himself to be carried. Its duties are public. It is a corporation of the character that is ordinarily empowered to exercise the right of eminent domain, which is one of the highest powers of the sovereignty, the power to take private property for a public use. Therefore a corporation can only exercise that power when the right to exercise it is delegated by the sovereign, and then only for a public use. It is only where the corporation is a public service corporation, a quasi public corporation, that it can be authorized by the Legislature, by the sovereign, or invested with the exercise of that power. Now, there is no such corporation, no such business as that, included in title 2 of chapter 34 of the General Statutes of 1866, and I feel therefore compelled to hold that this corporation could not have been formed under that title, for it is not at all of the character of the businesses that are named for which corporations may be formed, and, even although that title might be extended to kinds of business that are not particularly named, they would.have to be corporations of a similar character in order to come under it. This is not of similar character to come under it, and therefore, if it was not a corporation formed under title 1, its business was not such

as would allow its promoters to form a corporation under title 2, and they would have no authority under the Statutes of 1866 to form a corporation at all.

The question, therefore, is narrowed to the consideration of whether the business that these promoters proposed by the articles of incorporation to engage in was such as would permit of incorporation under title 1. If it was not, then it was not a corporation. Title 1 in its heading states it to refer to corporations authorized to exercise the power of eminent domain. Then it specifies "railways, canals, and slack water navigation, either in lakes or rivers," and some other kinds, perhaps, but all evidently public service corporations, quasi public corporations, corporations which under the laws it has been always understood might be invested with the right to exercise the power of eminent domain for public use. As I said before, a street railway is a corporation of that character. It is a quasi public corporation. Its duties are to render public service. Now, it is true that street railways, by that name, are not mentioned in title 1. Railways are mentioned as the very first kind of business that is named in the title. It also includes "any other public improvement," any association formed for the purpose of carrying on the work of public improvement; but it seems to me that the title of "railways," without more, covers the case of street railways. In other words, that "railways" is a generic title which covers all kinds of railways. A railway is a way which is made for the movement of cars, or something of that character, upon tracks that are laid down either on the street or somewhere else. They are not propelled as ordinary vehicles, such as wagons and carriages, are on the highways generally, but require for their operation that tracks be expressly formed to be moved upon, and a street railway is of that character. Therefore, it is distinctly a railway. Now, there is nothing in that statute which would indicate that street railways were not included in it. They are railways. They perform public functions. It is proper to invest them with the power to exercise the right and power of eminent domain. There is no reason in the world why they should be omitted. It is true, as stated by Judge Mitchell in some of the cases, that, where the word "railway" is used in statutes, it usually refers to commercial railways. I do not think there was anything in his statement (because he was usually pretty careful) that it was universally so, and that there were no exceptions, because, if he had made that statement, he would be incorrect. I think it is true that the statutes to which he refers are usually statutes enacted for the purpose of regulating commercial railways and their use in the state. Such statutes have provided that such railroads shall have signs at crossings of streets and highways, and that they shall give notice of the passing of trains by ringing the bell or sounding the whistle, and also, perhaps, that in respect to couplers they should use none except those that couple automatically by impact for the safety of the employés employed in the operation of the railroad. Now, all those provisions would have nothing to do with street cars, and, where there was such a provision in a statute, is is easy to see that street cars were not intended or meant. The same may be said of the act of the Legislature abolishing what is known among lawyers as the "fellow servant

rule" as a defense in the case of injury to employés upon a railroad. That would have no application to a street railroad, because the dangers to which employés are subject on an ordinary commercial railroad do not occur in the case of a street railroad. There is another kind of railroad that has been established and used in this state to some extent, which is entirely a private railroad, which could not exercise the power of eminent domain, and would not be entitled to. No one would be entitled to be incorporated for the purpose of running such a railroad, although it might be done by a corporation that was formed under title 2 for carrying on the lumber business; but it is well known that men engaged in lumbering in this state have private railroads running for some distance, some miles, for the purpose of moving their logs and getting them to mills or to the streams where they may be floated, and it is very possible that, although those railroads are not formed under any charters, they are or may be owned by corporate bodies. A good many of these regulations would apply to them, such as the regulations requiring signs if such a railroad should be run across a public highway, or before a locomotive should pass a highway there should be warning given by ringing the bell or sounding the whistle, or something of that kind; and the Supreme Court of the state have held that the law abolishing the fellow servant rule does apply to this kind of railroads, although they are not mentioned at all in the act, the act mentioning only railways. So it is not true that where railways alone, without more, are mentioned in the statute, it always refers to a commercial railway, and I see no reason why it should not, as it is used in title 1, c. 34, include street railways, as well.

Now, section 13 of that act, and sections following, provide for the procedure, notice, and use of the power of eminent domain. No; that is not true. Section 13 provides in respect to what property matters it may be exercised; that is, to obtain the right of way over and across any lands needed for the construction of any railway, telegraph, and the necessary sites and grounds for depots, shops, or other buildings requisite for the purpose. Now, it may be true that a street car company which confines its tracks entirely to the streets, as it properly ought to, and ought to be expected to do, would not need the exercise of the power of eminent domain for the purpose of obtaining a right of way, if it obtained that right of way from the city council, but it would or might need the exercise of the power of eminent domain for many other purposes, such as obtaining sites for shops and for other buildings necessary for the conduct of the business. Now, even in the old days when this was a horse railroad here in Minneapolis, it was necessary to use buildings. The street car company could not get along if confined to its right of way entirely. It would have to have some place to put up its cars at night; and, when it was run by animal power, to house its animals and feed them. There would be no opportunity to do this if they had to keep the animals upon the streets. It would not be expected. And where the corporation has the authority to exercise the power of eminent domain it may exercise it in a case where it might be convenient, although it might get along without. It would also, besides having to get a place to house its cars and its animals, need to have shops for the purpose of repairing its cars

from the result of the natural wear and tear and breakage which must happen to such things, and, as a matter of fact, it is well known to the old residents that the street car company did at a very early day obtain such ground, not by the exercise of the power of eminent domain, but by purchase. For instance, when this line was first established, I know that it obtained down in my neighborhood a block of land upon which was formerly the residence of Caleb D. Dorr, down between Thirteenth and Fourteenth Avenues Southeast, and upon that established barns and stables and places to house cars, and at a later day it obtained on the east side—I am a great deal more familiar with that than upon the west side—it obtained a block of land from Farnham & Lovejoy somewhere about Second Avenue North between Third and Fourth streets, using that whole block. Perhaps that was done after they changed to electricity. My recollection of its use was as a storage place for electric cars. It would necessarily be obliged to have storage places for cars when not in use in a portion of the nighttime. There is generally a time somewhere between midnight and morning when the cars are not in use, and when they would be an obstruction and nuisance if allowed to stand upon the streets, and the city would not permit this; or that they should be allowed to stand upon the streets when they were not in use in the day or nighttime either. Consequently there would have to be some place provided for keeping them during those times; and also, as I said before, for the location of shops, for repairs at least, and it seems to me that it would be entirely proper to obtain through the power of eminent domain, if it could not be done by purchase, shops for the building of cars, although that would not be absolutely necessary, as cars might be purchased from other persons who built cars, but it would be a proper exercise of the power of such a corporation to build its own cars, and proper for them to obtain, by the exercise of the power of eminent domain if necessary, the proper site for building those cars. I will therefore conclude that this corporation which attempted, so far as the incorporators were concerned, to be organized under title 1, c. 34, Laws 1866, was so organized under that title.

Then the question comes whether the contract made between the city and the complainant, the street car company, as to fares still continues in force; and I understand it to be admitted by counsel for defendant that there was such a contract made by virtue of the ordinance of July 9, 1875, and that that contract was valid and enforceable and binding upon the parties during its existence, the claim on the part of the counsel being that it ceased to exist in 1903, when, as they claim, the charter of the street car company ceased also to exist, having, as he thought, been organized under title 2 of chapter 34 with the limitation of 30 years, but under my holding that it is yet a corporation, and that the charter privileges inured to the company as a contract by virtue of that grant, the power to make the contract being given, if not by the charter, by the act of March 4, 1879 (Sp. Laws 1879, p. 410, c. 299), which validated in terms that contract.

It is claimed, also, on the part of the defendant, that this was only a company authorized to establish and operate street cars run by the motive power which is mentioned in that contract, either animal

or pneumatic power, and that, when it ceased to use that power, it ceased to be the same corporation, that it gave up its corporate rights, or its contract rights under that ordinance by ceasing to use that particular kind of power. My conclusion is different from my reading of the contract. There is no doubt that at the time this contract was entered into and this ordinance was passed and accepted by the street car company it was understood that the street car service to be established under it would be one in which the cars would be propelled by animal power. It was provided it should be either by animal or pneumatic power. I think the statement of Judge Koon is true that pneumatic power was something that was somewhat fanciful at the time; that it had not been tried for such purpose. I never knew of its being tried for a purpose of that kind. I do not understand how such a power could be made applicable to the propulsion of a street car. Pneumatic power is something that is done by compressed air; but how it can be compressed and applied to such a use I do not understand. Still this contract does seem to contemplate that such power may be used. It does contain provisions which shows it was contemplated, and also that they might change the kind of power to be used, for it says:

"No propelling power or machinery of any sort should be used after it should prove to be a public nuisance."

This provision follows immediately after the words that provide for the use of such power. Then it provides, also, that the street car company should connect with other street car companies, but they shall permit no locomotive, freight, or passenger car, such as are usually run over the general railways of the state for the transportation of freight and passengers, to be used unless authorized by the city council. It contemplates that even those may be used if authorized by the city council, "and that the said Minneapolis Street Railway Company, and any other street railway company which the council may charter under section 3 of this ordinance shall each allow the other to connect with and jointly use such portions of the track belonging to each as the convenience of the traveling public may require, upon such equitable terms as may be agreed upon" between the parties. There is some provision that they shall only allow cars from other tracks to come on their railway track that are propelled by such power as the council—

Judge Koon: It is the earlier part of section 4 judge. "Said company may connect with any other railway upon which power is used similar to that authorized to be used on street railways by the city council." It is just above where you commenced to read.

The Court: That is it. It does not confine them to cars that are run by animal and locomotive power, but to such as may be authorized to be used on street railways by the city council. It contemplates that the city council may authorize different kinds of power to be used. I need not refer to the provisions of this ordinance in respect to the rates of fare. It has been discussed so much and is so well understood by counsel and anybody listening to the argument here. The provision is, in short, that the street railway company may

fix the rate of fare, the rates that shall be paid for fare, but shall not charge more than five cents for each passenger. It also provides that the city council may, at the expiration of five years, and at terms of five years thereafter, fix the fare so that such sum shall be just and reasonable, providing it shall not reduce the fare below five cents over any one continuous line.

Now, that contract, as was said, was validated by the acts of the Legislature of 1879, and counsel for defendant admits that it was a valid contract, and as long as the corporation of the complaint continues, so far as it has not been changed by the parties, the ordinance of 1878 may properly be considered as to the power to be used, as it authorized the construction of a single railroad commencing at the intersection of Nicollet avenue and Thirty-First street, and thence on First Avenue South, and thence from First Avenue South to Grant street, thence from Grant street to Nicollet avenue, thence on Nicollet avenue to the southern limits of the city, with all turnouts, switches, and other appurtenances which may be convenient and necessary to operate such line of railway by animal, steam, or other power, so that, notwithstanding the ordinance of 1875, the council assumed the power under that to authorize the use of other power upon specific portions of the street railway. Of course, in this particular ordinance it reserved the right to prohibit the use of steam on any part of that line which it deemed would subserve the public good by such prohibition, and that was also one of the ordinances which was validated by the act of March 4, 1879. My construction of that contract is, so far as the power is concerned, that the street railway agreed to use either animal or pneumatic power in the running of the railway, but there was nothing in that contract which would prohibit both parties to that contract, the street railway and the city together, from changing that provision, and, if they should find that some other power was desirable to be used instead of either horse or pneumatic power, from agreeing that such power should replace the old power and be used instead. In other words, there is nothing in that contract that makes it different from other contracts, or which prohibits the parties to the contract, if they both agree, from changing it in any respect. The parties to the contract might change it by mutual agreement; but one party alone could not change it, of course, without the consent of the other.

Perhaps the only remaining proposition is whether this contract was changed by consent of the parties by the ordinance of September 19, 1890. which ordinance was accepted by the street car company, and which contained very many provisions which I need not refer to, because it is only claimed that this portion of the contract fixing the fare was changed by the eighth section of that ordinance, and which provided that:

"In the construction, maintenance and operation of said lines of railway said Minneapolis Street Railway Company, its successors and assigns, shall at all times be subject to all the conditions and limitations and other provisions of an ordinance entitled 'An ordinance authorizing and regulating the street railways in the city of Minneapolis, passed July 9, 1875, and approved July 17, 1875, as the same has been amended and is now in force' [that is, the original ordinance] and all other ordinances of said city now in force, or hereafter adopted, so far as is applicable."

Now, it does not seem to me that this touches the rates of fare at all. It says "in respect to construction"—that is not fare. "Maintenance"—that is not fare. "And operation." That is, how the cars shall be run and what shall be done in respect to that by the street railway company. The company shall be bound by the provisions of this original ordinance and other ordinances amendatory thereof, and all other ordinances of said city "now in force, or hereafter adopted, so far as applicable." Now, that is true. So far as relates to construction, maintenance, and operation of these lines, the street car company is, by the provisions of this ordinance, and its acceptance of this ordinance, bound, and it is subject to all these things; but there is nothing in this that would bind it to that change as to fares nor permit the council to make such change, nor agree to be bound by any change that the council might thereafter make with reference to the right of the street railroad company to collect fares. That in the original ordinance is a distinct provision. It comes under section 8 of the original ordinance, and is a separate provision in respect to fares and the right of the company to collect fares. This provision in section 8 of this ordinance of September 19, 1890, has no reference to fare at all, but has reference to other subjects, and it certainly is a rule which the most vague ideas of equity would consider necessary to be applied, that there should be no forced construction of language of that kind used to broaden it and extend it to subjects which, apparently, were not by the parties intended to be included under it. It must be plain that both parties would understand naturally the scope and meaning of a provision of that kind, as not referring to fares, and the language must be such that the court could say that the parties must have understood that it did cover the subject of fares, or else it does not cover that subject. If there were other ordinances which were proper to be referred to in such a way relating to the construction, maintenance, or operation of the road, entirely different from a matter of fares, and this general statement that ordinances in the future might be passed relating to the same subject, and, so far as applicable, would be binding upon the company, but would not by any reasonable or fair or honest construction be held to include the provision of this original contract in respect to fares. That was too important a matter.

It seems to me that the general rule laid down by the Supreme Court of the United States in that Detroit case which has been cited on both sides is very clear on that subject. So in some other of the cases that have been cited. I think that the general and fair understanding applied to contracts would exclude any such thought as that the idea of the subject of fares was contemplated by anything stated in that section. Therefore I shall hold that that section does not, and did not, authorize the city of Minneapolis on the 9th of February last, or now, or at any time, to change or legislate upon the question of what reduced fares the complainant was entitled to collect for its compensation for the carriage of passengers upon its cars.

The result of all this is that I think the injunction must issue as prayed for in the complaint. I have gone over the subject as far as seems necessary.